```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
RASVINDER DHALIWAL,                     :        15cv706 (DLC)
                                        :
            Plaintiff,                  :        OPINION & ORDER
                                        :
            -v-                         :
                                        :
SALIX PHARMACEUTICALS, LTD.,            :
                                        :
            Defendant.                  :
                                        :
----------------------------------------X
```

APPEARANCES

For Rasvinder Dhaliwal:
William R. Fried
Janice I. Goldberg
Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016

For Salix Pharmaceuticals, Ltd.:
Benjamin J. Razi
Patrick M. Phelan
Stephen Kiehl
Andrew Leff
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4956

DENISE COTE, District Judge:

Defendant Salix Pharmaceuticals, Ltd. ("Salix") has moved for summary judgment on the remaining claims in this action, retaliation claims brought under the federal False Claims Act ("FCA"), 31 U.S.C. § 3730(h), and the New York False Claim Act

("NYFCA"), N.Y. Fin. Law § 191.  For the following reasons, the motion is granted.

## BACKGROUND

The following facts are undisputed or taken in the light most favorable to the plaintiff, unless otherwise noted.  Salix was a pharmaceutical company that sold prescription drugs and devices to treat gastrointestinal disorders.  It was acquired by another pharmaceutical company in 2015.

Salix hired Rasvinder Dhaliwal ("Dhaliwal") in 2005, and she was employed by Salix until 2013.  Dhaliwal's FCA allegations largely concern events that transpired during 2012 and 2013.

Salix hired Dhaliwal to work as a Territory Manager for the New York City area and promote Salix's products to physicians and hospitals.  Dhaliwal became a Senior Territory Manager in 2007, and a National Accounts Manager ("NAM") in the Managed Markets department in 2008.  NAMs promoted Salix's products through a broader customer base than physicians and hospitals.  Dhaliwal's customers included Managed Care Organizations, Pharmacy Benefits Managers, Group Purchasing Organizations ("GPOs"), state Medicaid plan administrators, Medicare carriers, hospitals, and medical societies.  As a NAM, Dhaliwal reported to Salix Senior Vice President of Managed Markets John Temperato

2

("Temperato"). Dhaliwal was promoted again to Senior Manager, National Accounts in 2010.

Salix hired Philippe Adams ("Adams") as Director of Managed Markets in 2010. Adams reported to Temperato and was one of Dhaliwal's supervisors. Adams gave Dhaliwal generally positive performance reviews in 2010 and 2011. Dhaliwal reports that she had difficulty working with Adams.

Beginning in 2012, Dhaliwal observed what she describes as improper sales and marketing practices at Salix. These practices fall into four categories.

### I. Promotion of Solesta

Salix acquired a product known as Solesta through its acquisition of Oceana Therapeutics, Inc. around December 2011. Solesta is used to treat fecal incontinence in adults.

In the spring of 2012, Dhaliwal participated in preparing a slide deck on Solesta that would be used in Salix's presentations to payers. In an April 2, 2012 email to Temperato, she suggested dozens of changes to a draft of the slide deck. Dhaliwal warned that the deck "does not set us up for success." Some of her suggested changes were grammatical or stylistic in nature -- for instance, correcting spelling errors or suggesting new titles for certain slides. Others identified substantive errors in the deck and questioned Salix's support

3

for certain statements.[1]  Temperato responded to Dhaliwal's edits with the comment, "[a]ll good stuff."

Second, Dhaliwal told Salix's Chief Development Officer around May 2012 that Salix was endangering patient safety by distributing injection needles for Solesta without markings that would assist doctors in knowing when they had inserted the needles to the recommended length.  According to Dhaliwal, Salix did not act on Dhaliwal's suggestion for adding markings to the needles.

Third, on August 13, 2012, Dhaliwal sent Adams and others an email suggesting changes to a Solesta product brief.  The product brief includes citations to clinical evidence and other supporting documentation to encourage favorable coverage policies for Solesta.  The next day, Adams commended Dhaliwal's work on the brief.

Finally, around October of 2012, Dhaliwal advised Temperato and Salix's Director of Key Account Managers of a physician's concerns with a Solesta training video.  In none of these instances concerning Solesta did Dhaliwal assert that Salix's

---

[1]  For instance, with reference to the tenth slide, the email states "Cost of FI was estimated at $19.5 billion <u>Bullet needs to be removed</u> THIS IS WRONG-$19.5 billion figure refers to cost of URINARY incontinence and overactive bladder . . . . not FECAL incontinence . . . ."

practices would result in the submission of false claims to the Government.

## II. Educational Programs

Dhaliwal attended an April 2012 gathering that Salix characterized as an educational program, but that Dhaliwal considered to be little more than a social event. During the event, Dhaliwal learned that an employee of the Food and Drug Administration ("FDA") was in attendance. Dhaliwal called Temperato to report her concern that the FDA employee would see that the event was simply a "fun evening" for medical faculty. According to Dhaliwal, when she reiterated that she would like to speak of her concerns to a Salix legal compliance officer, Temperato indicated that he would speak to the officer himself the following Monday. Dhaliwal does not assert that she expressed any concern that Salix's behavior would lead to false claims being submitted to the Government.

## III. Disparities in Discounts

In August 2012, Dhaliwal learned that Salix was effectively offering certain GPOs deeper discounts than other GPOs on one of Salix's products. Dhaliwal shared this information with Adams, who explained in an August 29 email that the apparent disparity in pricing among GPOs would be a "temporary situation."

In September 2012, Dhaliwal again told Adams of her concern that certain GPOs were receiving better pricing on that product than others. According to Dhaliwal, she explained to Adams that this appeared to act as an inducement to purchase the product within a specified time frame from those GPOs that offered better pricing, and that one customer of a GPO had shifted its purchases to another GPO for that very reason. At no point did Dhaliwal suggest to Adams that this situation would lead to false claims being submitted to the Government.

**IV. Budgeting of Continuing Medical Education Programs**

In October 2012, Dhaliwal objected to paying for an upcoming January 2013 continuing medical education ("CME") program out of Salix promotional funds without going through Salix's grant committee. Dhaliwal paid for a similar event held around October 25, 2012, but refused to pay for the January 2013 event when the Regional Sales Manager asked her to do so. Dhaliwal told him in substance that it was unlawful for Salix to directly pay for a CME dinner and that the request had to go through the grants process. According to Dhaliwal, the Manager was annoyed and stormed off.

Dhaliwal reported these events to a Salix Associate Director the following day. Dhaliwal asserts that the Director told her that she had done the right thing by refusing the

request to pay for the January 2013 dinner. He advised her to put through the expense for the October 25 dinner, but not to directly pay for CME dinners in the future. Dhaliwal also told the Director of Key Account Managers of these events, who according to Dhaliwal, stated that "we can't have this stuff happening" and that he would "run on this quick." Dhaliwal does not assert that she ever claimed that the practice would result in the submission of a false claim to the Government.

**V. Dhaliwal Takes Leave in 2012**

During 2012, the year in which these events occurred, Dhaliwal experienced serious difficulties in her personal life. In February 2012, chemical fumes entered Dhaliwal's apartment. Salix granted Dhaliwal's request for time off to deal with this issue.

Around October 29, 2012, Hurricane Sandy hit New York City and Dhaliwal's apartment lost power, heat, and hot water. Dhaliwal took approximately a week of emergency leave during this period to address her living situation. During this time, Dhaliwal communicated with Salix CEO Carolyn Logan ("Logan"), who was supportive and offered assistance in finding her a hotel room.

In early November 2012, Salix and Dhaliwal had a dispute about her failure to attend a four day training program. On

7

November 12, Dhaliwal began an unscheduled medical leave of absence.

Dhaliwal never returned to work at Salix. During this third period of leave, Dhaliwal wrote to Logan, "its been really rough. the hurricane was the last thing i needed. just trying everyday to get better." Dhaliwal and Temperato spoke by telephone in December 2012. Dhaliwal recorded this conversation. During the call, Temperato informed her that he had created a new position for her. Following the call, Dhaliwal decided to retain counsel. In none of her communications with Salix during 2012 did Dhaliwal express concerns about fraud on the Government.

A February 1, 2013 letter from Dhaliwal's counsel to Salix indicates:

> Ms. Dhaliwal also has certain concerns whether the company and/or certain of its managers have treated her fairly and in accordance with the company's own policies (i.e., the anti-retaliation provisions in Salix's Code of Conduct) and/or applicable employment laws, which matters will also need to be addressed prior to Ms. Dhaliwal returning to work.

The letter did not indicate any concern about a fraud on the Government.

On March 14, Dhaliwal met with Logan and Salix's Chief Financial Officer ("CFO") at a dinner arranged by counsel. At the dinner, Dhaliwal communicated the four categories of concerns described above. She also described the harassment and

retaliation she believed she suffered when she tried to raise her concerns to her superiors. According to Dhaliwal, Logan assured her that she was a valued employee and that her concerns would be investigated. Dhaliwal submits no evidence that she told Logan or Salix's CFO at the dinner that Salix's conduct could result in fraud on the Government. Salix's Human Resources department sent Dhaliwal a letter dated April 25 asking her to inform Salix if she would be returning to work by May 3, 2013. On May 2, Dhaliwal sent a "Resignation Letter" to Logan. Dhaliwal believes her employment was constructively terminated shortly after the March 14 dinner.

Around February 1, 2013, Salix received a subpoena from the United States Attorney's Office for the Southern District of New York requesting documents related to Salix's sales and promotional practices for certain products, including the product for which Dhaliwal had complained that Salix had given some GPOs better prices. Dhaliwal began cooperating with the Government's investigation into Salix's business and marketing practices in 2014. Dhaliwal did not have any contact with the Government regarding allegations of impropriety while she was employed at Salix.

**VI. Adverse Employment Actions**

Dhaliwal describes numerous incidents beginning in 2012 which she believes demonstrate retaliation for raising the concerns in the four areas discussed above. These principally include a denial of a promotion, verbal abuse and admonishment by her supervisors, a refusal to accommodate her workload and scheduling issues, a denial of earned compensation including bonuses and merit salary increases, demotion to an isolated position, and stripping of her earned stock awards. She also asserts that her constructive discharge was retaliatory.

## PROCEDURAL HISTORY

Dhaliwal filed this action on January 30, 2015 as a qui tam action under the FCA and various state false claims laws. As the relator, Dhaliwal alleged, inter alia, that Salix provided kickbacks to healthcare providers to prescribe Salix products. The case was transferred to this Court on August 3, 2015.

On June 9, 2016, the Government elected to intervene, the case was unsealed, and stipulations of settlement and dismissal were filed between Dhaliwal, Salix, and the federal Government. Thereafter, various state governments intervened, and on December 2, a joint notice of dismissal was entered between the state governments and the defendants.

In June and July 2016, prior counsel for Dhaliwal litigated the extent of their entitlement to fees. See United States v. Salix Pharm., Ltd., 15-cv-706 (DLC), 2016 WL 4402044 (S.D.N.Y. Aug. 18, 2016). On December 7, Dhaliwal notified the Court of her intent to pursue her individual surviving claims against Salix. Following a conference on December 13, Dhaliwal and Salix engaged in discovery. On June 16, 2017, Salix moved for summary judgment on Dhaliwal's retaliation claims. The motion became fully submitted on July 21.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. See Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).

"[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004) (citation omitted) (emphasis omitted).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

The FCA is a statutory scheme designed to discourage fraud against the federal Government. See Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 1996 (2016). It

> authorizes private citizens to sue on behalf of the United States to recover treble damages from those who knowingly make false claims for money or property upon the Government or who knowingly submit false statements in support of such claims or to avoid the payment of money or property to the Government.

United States ex rel. Lissack v. Sakura Global Capital Mkts., Inc., 377 F.3d 145, 146 (2d Cir. 2004); 31 U.S.C. § 3729(a)(1)(A)-(B).

The FCA's whistleblower provision, 31 U.S.C. § 3730(h)(1) ("Section 3730(h)(1)"), provides in relevant part:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

"The New York False Claims Act follows the federal False Claims Act and therefore it is appropriate to look toward federal law when interpreting the New York act." State ex rel. Willcox v. Credit Suisse Sec. (USA) LLC, 36 N.Y.S.3d 89, 90 n.2 (App. Div. 1st Dept. 2016) (citation omitted).

While the Second Circuit has not articulated a test for establishing an FCA retaliation claim, other circuits and district courts in this Circuit have generally required a plaintiff to show that "(1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." United States ex rel. Chorches for Bankr. Estate of Fabula v. American Med. Response, Inc., 865 F.3d 71, 95 (2d Cir. 2017). "[P]roving a violation of § 3729 is not an element of a § 3730(h) cause of action." Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 n.1 (2005). Thus, Section 3730(h) "protects an employee's conduct even if the target of an investigation or action to be filed was innocent." Id. at 416.

To determine whether an employee's conduct was protected under the FCA, courts must evaluate whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." United States ex rel. Uhlig v. Fluor Corp., 839 F.3d 628, 635 (7th Cir. 2016) (citation omitted). "[M]ere investigation of an employer's non-compliance with federal regulations is not enough" to constitute protected activity under Section 3730(h)(1). Fisch v. New Heights Acad. Charter Sch., No. 12cv2033 (DLC), 2012 WL 4049959,

14

at *5 (S.D.N.Y. Sept. 13, 2012). "[A]lthough correcting regulatory problems may be a laudable goal, those problems [are] not actionable under the FCA in the absence of actual fraudulent conduct, and so reporting them [falls] outside the purview of the FCA's anti-retaliation provision." United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 60 (1st Cir. 2017) (citation omitted). In other words, "[m]erely grumbling to the employer about job dissatisfaction or regulatory violations does not . . . constitute protected activity." United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 743 (D.C. Cir. 1998). Rather, the employee's investigation "must be directed at exposing a fraud upon the government." Fisch, 2012 WL 4049959, at *5 (citation omitted).

With respect to the notice requirement, a plaintiff claiming retaliation must establish that the employer had knowledge of the employee's protected activity. The standard for notice is "flexible": "[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged." United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd., 389 F.3d 1251, 1260 (D.C. Cir. 2004) (citation omitted). "Unless the employer is aware that the employee is investigating fraud, the employer [cannot] possess the retaliatory intent necessary to establish a violation of § 3730(h)." Id. at 1260-61 (citation omitted). An employee who

15

simply engages in behavior wholly consistent with his job description will not, without more, provide notice that he is engaging in protected activity. Id. at 1261. "[P]laintiffs alleging that performance of their normal job responsibilities constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice." Id. (citation omitted). Thus, where an employee is tasked with investigating fraud, he must go beyond the assigned task, for example, by alerting a party outside the usual chain of command, id., or "[c]haracterizing the employer's conduct as illegal [and] recommending that legal counsel become involved," Fisch, 2012 WL 4049959, at *6 (citation omitted).

Finally, while the Second Circuit has not defined the standard of causation for FCA retaliation claims, the Supreme Court has clarified that the term "because of" typically "imports, at a minimum, the traditional standard of but-for causation." EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2032 (2015) (Title VII); see also Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013) (holding that Title VII retaliation claims "must be proved according to traditional principles of but-for causation, not the lessened [motivating-factor] causation test," and describing but-for causation as the background standard against which Congress

16

legislates).  Temporal proximity between the protected activity and the retaliatory action may strengthen the inference of a causal connection.  See <u>Gorman-Bakos v. Cornel Co-Op Extension of Schenectady Cty.</u>, 252 F.3d 545, 554 (2d Cir. 2001).

Dhaliwal has failed to provide evidence that raises a question of fact that she ever engaged in conduct protected by the FCA.  As a consequence, she has also failed to provide evidence that Salix understood her to be engaged in protected conduct or that any of the actions it took regarding her employment were taken "because of" that protected conduct.  Each of these issues is addressed in turn.

Dhaliwal has failed to supply evidence that her complaints to her supervisors constituted protected conduct.  There is no evidence from which one could reasonably infer that her complaints to Salix regarding any of the four categories of concerns she raised during 2012 or listed again at the March 2013 dinner with Salix executives were directed at exposing or avoiding a fraud upon the Government.

Because Dhaliwal has failed to supply evidence that she was engaged in protected activity, she also cannot supply evidence that she gave Salix notice of any protected activity.  In her brief in opposition to this motion, she relies exclusively on the March 2013 dinner with Salix's executives as the occasion on which she gave Salix notice of her protected activity.  Her

17

declaration in opposition to this motion gives a very brief description of that dinner conversation. Of relevance here, it simply lists the four categories of concerns she expressed about Salix's marketing and sales practices. At no point does Dhaliwal assert that she provided notice during the dinner of a concern that Salix was engaged in conduct that would permit or encourage a fraud upon the Government.

Reading her submissions in opposition to this motion generously, Dhaliwal may be arguing that her complaints about the quality of the Solesta slide deck and product brief should have put Salix on notice of her concern that there was a risk of a fraud on the Government, specifically, a risk of a false claim being made to the Government for reimbursement, or in her words for coverage, of Solesta. Dhaliwal argues that "[i]f [Salix] prevailed in obtaining favorable policies [regarding Solesta], it would increase prescribing and purchasing of the Solesta device, which would then lead to potential false claims and potential harm to the government, among others, who would pay for a medical device that it might not have agreed to pay for otherwise." Dhaliwal has not provided any evidence, however, that she articulated such a concern in 2012 or 2013. Nor has she provided evidence of any statement that she made in 2012 or 2013 that would have reasonably caused anyone who heard her

18

complaints to consider this chain of events and a likelihood of a false claim being presented to the Government.

For similar reasons, Dhaliwal likewise fails to supply evidence that she would not have been subjected to the retaliatory acts she alleges but for her protected activity. The record supplies no evidence to suggest that the adverse employment actions that Dhaliwal alleges she suffered were motivated by a desire to retaliate against her for conduct protected by the FCA.

## **CONCLUSION**

Salix's June 16, 2017 motion for summary judgment is granted. The Clerk of Court shall close the case.

Dated: New York, New York
September 14, 2017

```
                    _____
                           DENISE COTE
                    United States District Judge
```